Final case before this morning's arguments, 23-3560 Southern Iowa, United States v. Johnathon Rose. Mr. Destmer, the court appreciates your accepting the CJA appointment. Well, thank you. It's been a fun time. May it please the court, counsel. Simplistically, this is an appeal after the district court denied a motion to suppress arising out of a traffic stop in Clinton, Iowa. However, there are multiple facets that need to be discussed. I think there's four, and quite frankly, I think it's easiest if the court takes them in reverse order. Number four, or the one that I think is easiest, the government has conceded that there was an error in the career offender determination. So in any aspect, this case will be remanded back to the district court for purposes of a third sentencing. That's kind of one of the half points. You know, I'm attorney number three. Attorney number one did the suppression and the plea. Attorney number two did the sentencing, first sentencing and the first appeal. As the court noted, there was a 22-55, and I inherited this case. So a lot of the documentation and history of this case is not mine. I want to adopt what my counsel did, but if there was tactics or strategies that I'm not fully aware of, I hope the court understands. So then we get back down to the suppression. To me, there's three parts of the suppression. The last part is they got a search warrant. They got a search warrant for the home or the residence where he was. And in part of the search warrant, they made specific representations about what Mr. Rose said during his reported statements or interviews. The search warrant is clearly the most fruit of the poisonous tree that goes on as far as where it goes and how it goes. And then second in the tier of the three is whether or not there was a Miranda. There's a video. The video is the squad car. Detective Winters has Mr. Rose in the car, and he reads the Miranda warrants to the squad car, and I think it's a 23-31. And you don't hear Mr. Rose's specific response. But Detective Winters' answer to whatever statement Mr. Rose said was, no, you're going down to the police department. I have tried to stretch my imagination and figure out how there can be some kind of knowing consent or acknowledgement or authorization stated in response to, I have to tell you, your Miranda rights, where the response, the affirming response, leads the officer to say, no, you're going down to the police department. I don't see it. So then if the government has not met the burden of a clear and specific acknowledgement of the Miranda rights in the waiver, then I think it's very clear they have failed to meet the burden. Do you have a case that says that the, I mean, I understand the statements have to be voluntary, but do you have a case that says you've got to orally say, I agree to, I understand the rights you've just given me? I think this court has said on multiple occasions that it's always depending upon the circumstances. I understand that. So why isn't it sufficient that the officer reads them to him, and then he voluntarily starts talking? There has to be an acknowledgement of some kind of affirmation on behalf of the defendant. Okay, that's what I was asking is, do you know of a case that says that? As I sit here, I know that I tried to cover those types of issues in my briefing. I thought I did. I'm looking quickly. I do not have a specific case that comes to my mind in response to your question. We can look at the briefing.  But I think that in further response to what you're concerned or what the concern is, my thought is that there has to be a knowing and voluntary waiver, and there has to be some kind of acknowledgement of a knowing and voluntary waiver. Just talking. Once having heard the warning, and then you start talking, is she voluntarily waiving it? How does the court accept the awareness that Mr. Rose actually knew, heard, and understand when all you get back after the Miranda warnings is the officer's response, no, you're going down to the police department? I just don't see that. It has to be a knowing and voluntary waiver, and I don't see that since that burden is on the government. That's my point. And arising out of that post-Miranda description, those are the statements that the officer relied upon for the home, the application for the search warrant at home. So that gets us down to the first part, and the first part is the canine reliability. Now, I think that the case law has developed since the original briefing and the original argument. I think that there was no development made regarding whether or not the canine officer was an expert or a lay witness, and there's nothing in regard to the transcript regarding any part of that being a consideration by counsel or the court. The court, and this is one of the points where I do struggle with the concepts that the court has submitted as far as making a determination whether or not a dog is reliable. We have, and I invite the court to very clearly review and consider the 18-minute-plus view, the tape of the dog handler. The dog handler, the time period where the dog is actually out of the car is a very short and brief period of time. The court made the finding that the dog did make an alert or a hit, but there was also evidence that the dog was a passive indicator, but they had to stop him because he was barking at the door, the passenger door. The dog walks right past the passenger door the first time, does not hit, does not do anything, alerts on the hood. The police officer, the handler, says, that's the first time it's ever happened to me, and they open up the hood, and they look for the hood, and they don't even find anything, and that's all confirmed in the videos of both the dog handler and also the video of Detective Winters. Detective Winters' video starts off very clearly that Mr. Rose is trying to get out of the car, walking away from the car, and Detective Rose tries to send him back in. So we think that the Collier expectations and authority were very clearly met. Mr. Rose did have his own expert going through and analyzing all the records. exhibits 9 and 10 don't lead to the conclusions that the government suggests. Out of 95 pages, you don't understand what happens in the vast majority, and also in the testing and the analysis of his training, it's unclear to say the least. But the district court made some findings on that training, though, right? That it was sufficient? Yes. Are you saying those are clearly erroneous, or are you just saying it's just one part of the entire picture of this dog? My first answer is I think it's one part, and this is the part where I struggle, and the reason being is that the court had the same thing you're going to have, other than the officer's testimony. The officer's testimony, if you take it on its face, the officer says the dog alerts. But other than that, you have that same opportunity to see the documentation, the training certificates, and everything else. And for that reason, I want to be responsive to your question, but I want to also leave a little bit of time for rebuttal. So I will save the rest of my time for rebuttal, but that's acceptable to the court. Thank you.  Good morning, Your Honors. Brecklin Carey on behalf of the United States of America. May it please the court. The district court correctly denied Rose's motion to suppress on multiple fronts. Some of these have been highlighted by Mr. Dustemer here today, but I will confirm and say that Rose did knowingly, intelligently, and voluntarily waive his Miranda rights. And additionally, the drug detection dog that was called to the traffic stop of Rose's car was reliable, and his indication gave probable cause for the officers at that stop to search Rose's vehicle. However, due to a recent controlling case that has been issued after Mr. Rose's sentencing, his career offender sentence should be reversed and remanded for sentencing. Nevertheless, his case- Let me ask you about that. Which case do you claim is controlling? United States v. Day, Your Honor. And in that case, I think we declined to reach the issue. So isn't it still an open question in this circuit as to whether the Iowa domestic abuse assault statute is divisible or indivisible? My understanding, Your Honor, is that the specific code section that Mr. Rose is convicted under and the one that was addressed in Day specifically is for the domestic abuse enhancement, which falls for one or subsequent offenses. That within itself is not categorically a crime of violence. Specifically, the Day court concluded that convictions for simple misdemeanor domestic abuse assault and simple misdemeanor domestic abuse assault is not a crime of violence. Because a defendant can be convicted of those crimes without so much of the threatened use of physical force, the offense does not satisfy the career offender enhancement in that way. So is it the exact same offense at issue in Day as in this case? I believe so, Your Honor, yes. It is the same subsection. Let me ask you, he has a whole litany of other offenses. Did the government make any effort to see if this error that you concede might be harmless? In other words, did any of the other, he's got a bunch of theft and possession of firearms, third degree burglary, third degree burglary, theft with firearm and burglary. Did the government make any effort to see if any of those qualify as crimes of violence? To clarify upon your question, Your Honor, are you inquiring if at the sentencing stage that had been inquired or if I personally in preparation have reviewed those? Well, it seems to me that rather than conceding something that could be a harmless error, one might go back and look at the PSR and see what other convictions that he had. And if any one of those pretty clearly applies, one might say, well, there's an error under Day, but there's three others that qualify. And therefore, you don't have to send it back to the district court for resentencing. Yes, Your Honor. And my understanding is that none of the other offenses did clearly apply. And similarly, you've had nothing. So the answer is you've done that analysis and you don't think any of them amount to a crime of violence. I have done a brief overview of an analysis for that. And that was my understanding, Your Honor. Yes. And so then I assume the government will concede that he's not a career offender. We're talking about a career offender. Yes, that is correct, Your Honor. In front of the district court. Yes, that is correct, Your Honor. And that goes hand-in-hand with our ask that his sentence be remanded for resentencing because we see Day as being the controlling case here. That it would only be just that his sentence be remanded so we can account for this correction in the law. Yes, I'm just concerned about a waste of judicial resources. If you say we should remand it now and then you go back to the district court and say, well, one of these other ones qualifies, then we've wasted a bunch of time. No, Your Honor. This being remanded to the district court, the intention would be he would not be sentenced as a career offender. Are there any other questions involving United States v. Day or that issue before I move on? Thank you. I will mention the issue of the canine reliability that was brought up by Mr. Dustemer. The canine alert that was provided by the drug detection dog was sufficiently reliable and provided probable cause to search Mr. Rose's vehicle. There's a presumption of probable cause that attaches when a well-trained dog provides an alert. The question is similar to any probable cause analysis. It's if in the totality of the facts and circumstances surrounding the dog's alert, if a reasonably prudent person would be able to look at those facts and circumstances and believe that it is likely that evidence or contraband of a crime would be found within the place to be searched. There's no set checklist of required information relating to a certified canine that needs to be produced by the government. In fact, evidence of a dog's satisfactory performance in a training or certification program can itself provide sufficient reason to trust his alert. The Supreme Court has given us guidance in Florida v. Harris that if a bona fide organization has certified a dog after testing the dog's reliability in controlled settings, a court can presume, subject to any conflicting evidence, that a dog's alert provides probable cause for a search. Here, the district court had much more than that to work with. We learned that the drug detection dog here, whose name is Roman, was nationally certified in controlled substance detection by Von Licht Kennels and the Indiana Law Enforcement Training Academy in 2019 and recertified in 2020. The dog was certified to detect marijuana, methamphetamine, cocaine, heroin, and ecstasy. Roman had completed regular monthly trainings, which included open-air sniffs of vehicles which contained controlled substances. What about the argument that if you actually just look at the video, there seems to be some unusual actions on the part of the dog that may be not the typical kind of alert or indication? That's certainly something for the district court to be able to review that video and take into that totality of the circumstances analysis. Here, in this case, it's true that Roman did indicate at the front of the vehicle and the officer had stated, oh, that hadn't happened before. And then the officer took the dog back by the car for a second pass and the dog again sat, this time, at the passenger door of the vehicle. This information was provided to the district court and was part of the totality of the circumstances analysis that comes along with a probable cause determination. There was one thing that pertains to the dog sniff that was not entirely clear to me in the record, and that is, what does the record show that Officer Winter was doing at the time the dog first alerted? I think that was at 157.37 on the video. In other words, this goes to the issue of whether the stop was prolonged by the dog sniff. Detective Winter was still sitting in the front seat of his squad car and was continuing to write citations. We know from the record that by the time he was informed of the dog alert, he had completed his traffic stop duties. But at what time did he finish that, I guess is what I'm asking. Was that after the dog first alerted? Yes, Your Honor. It is around the time the dog alerted. I have as a time stamp of 159.15 is the time that he's informed that Roman alerted on the vehicle. During that time, Detective Winter was still typing on his in-car computer, finishing those citations. Briefly, on the note of the dog's reliability, I will make clear to the court that the witness that Rose had called did not show any inadequacy with the Drug Detection Dog Certification Program or that the circumstances surrounding the drug detection dog's alert were undermined in any way. The witness conceded that there's no legal standard setting a number of hours a dog must train, conceded that that witness held no certifications from any organization that certifies canines, much less he had not handled dogs in the last 13 years. The expert did not account for the 74 times Roman had been deployed or the additional training that Roman had received with his handler in the handler's home. Additionally, the witness took no issue with the validity of Roman's certifications. Considering that the way to be accorded an expert opinion is solely within the discretion of a presiding judge, the district court was not obligated to follow the opinion of Rose's expert. Instead, the district court did make a finding that Roman had a satisfactory performance in a nationally known certification and training program and had reliably hit on all sorts of things, including the car in this case. Accordingly, Your Honor, we ask that this court affirm Rose's conviction, yet remand his sentence for resentencing without that career offender enhancement. Thank you. Thank you, Ms. Carey. Mr. Dustimer? I probably will fill the minute and 13 seconds I have left, but we'll see. I think we invite the court to re-review or to review both Exhibit 1, which is Winter's video. Winter's is the body cam and it goes up to Mr. Rose when Mr. Rose is out of the car and Winter tells him to get in, and that goes all the way through to and including the Miranda warnings for what they're worth when he arrives back to the police department. We also invite the court to review the 18-minute, I think, and 33-second dog handling case. Like I said, it's very short in time as far as when the dog's out. I invite the court to watch. The dog is, in my summary, out of control. You see the officer tells him, sit, lay, doesn't do either. At one point, he goes over to the police car. He starts sniffing that. When he's done, they go, yeah, he lit both on the hood and on the side door, and then going back into the car. It's sit, stay. Dog doesn't do either. So my time is up. Thank you very much for your opportunity to visit. Sounds like my dog. Thanks, Mr. Dustemer and Ms. Carey. We appreciate your appearance today, and the case is now submitted. Court will be in recess until 2 o'clock this afternoon.